IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

MARY LEE SALSER,                    *

        Plaintiff,                  *

vs.                                 *
                                              CASE NO. 3:10-CV-17 (CDL)
CLARKE COUNTY SCHOOL DISTRICT,      *
et al.,
                                    *
        Defendants.
                                    *
_____
                                    *

O R D E R

Plaintiff Mary Lee Salser ("Salser") was employed by the Clarke County School District ("School District") as a speech language pathologist. Salser, who has rheumatoid arthritis, claims that the School District and its employees discriminated and retaliated against her in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and violated the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"). The Court previously granted Defendants' motion for partial summary judgment as to Salser's ADA claims based on acts and omissions that occurred prior to October 4, 2007. *Salser v. Clarke Cnty. Sch. Dist.*, No. 3:10-CV-17 (CDL), 2011 WL 56064 (M.D. Ga. Jan. 5, 2011). Defendants now seek summary judgment on the remainder of Salser's claims. For the following reasons, Defendants' Motion for Summary Judgment (ECF No. 40) is granted.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

The evidence, viewed in the light most favorable to Salser, reveals the following.[1]

I.  **Salser's Disability**

Salser suffers from a variety of medical conditions, including rheumatoid arthritis. Salser also has a compromised immune system and becomes ill very easily. As a result of her

---

[1] Defendants' statements of material fact that Salser failed to controvert with specific citation to the record are deemed admitted. M.D. Ga. R. 56. The Court has fulfilled its duty to "review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008) (internal quotation marks omitted).

rheumatoid arthritis, Salser has difficulty walking, and two to three days a week she is unable to perform any day-to-day activities.

## II. Salser's Job Duties

Salser began her employment with the School District as a Speech Language Pathologist ("SLP") in August 2001. The School District employs SLPs to "[d]iagnose and treat pre-school and school-aged children through high school with various communication disabilities." Pl.'s Resp. to Defs.' Mot. for Summ. J. [hereinafter Pl.'s Resp.] Ex. B, School District SLP Job Description, ECF No. 44-1 [hereinafter SLP Job Description]. Some of the "essential functions" identified in the School District's SLP job description include: (1) communicating with building principals and the SLP Coordinator to ensure program efficacy; (2) maintaining accurate, complete, and correct records as required by law, district policy, and administrative regulation; and (3) attending staff meetings. *Id.* Importantly, evaluation and therapy services cannot be delegated to anyone other than a certified or licensed SLP.

SLPs must provide therapy in accordance with a student's Individualized Education Program ("IEP"), which must be developed and reviewed in accordance with specific procedural requirements set forth in the Individuals with Disabilities Education Act ("IDEA"). A student's IEP designates the specific

amount of SLP therapy services the student is entitled to receive.

SLPs are responsible for developing therapy schedules which are disseminated to classroom teachers. Therapy schedules are usually developed so that students are not pulled out of the classroom for "specials" such as music, physical education, or art, or during the delivery of instruction in key content areas such as math or language arts. Therapy must be consistent to be effective, and it is important for an SLP to adhere to the established therapy schedule.[2] Because SLPs have highly specialized training, the School District does not employ substitutes to fill in for SLPs who are absent from work on an intermittent basis. Salser contends that her supervisor, Speech Language Coordinator Amy Arnold, was qualified to carry out the regular duties of an SLP, did not have a caseload of her own, and represented to others that she was available to act as a substitute SLP. Pl.'s Resp. Ex. A, Salser Aff. ¶ 3, ECF No. 44-1. It is undisputed, however, that if an SLP was unable to attend a scheduled therapy session, the School District required that the absent SLP make up the missed session with the student. Defs.' Mot. for Summ. J. [hereinafter Defs.' Mot.] Ex. 4, Arnold

---

[2] Salser notes that some scheduled therapy sessions were missed because of a student's absence, student testing, or a conflict between a student's scheduled therapy and some other school activity or function. Pl.'s Resp. Ex. A, Salser Aff. ¶ 5, ECF No. 44-1.

Aff. ¶ 11, ECF No. 40-4; Blake Dep. 25:6-11, ECF No. 36. Although SLPs have some flexibility to make up missed therapy sessions, a student who is entitled to SLP services once a week should not go more than a couple of weeks without receiving any therapy services. Arnold Aff. ¶ 11.

In addition to conducting eligibility evaluations and providing therapy to students, SLPs are required to assist in writing speech-related goals and objectives for IEPs. If a student is receiving special education services only because of a speech or language impairment, an SLP acts as the student's case manager and is responsible for convening an annual IEP meeting to review the student's progress toward annual goals. The annual review must be completed within one year of the date the IEP was written. If the annual review is not held by that deadline, the School District is considered out of compliance with state and federal requirements. Further, a student's SLP services cannot be unilaterally terminated by an SLP. To discontinue SLP services, an SLP must complete dismissal paperwork indicating that a student's parent has consented to the discontinuation of services. Salser contends that in her absence, a substitute could have filled in for her to complete IEP meetings. Pl.'s Br. in Supp. of Resp. to Defs.' Mot. for Summ. J. 8-9, ECF No. 43-2 [hereinafter Pl.'s Br.] (citing Grace

Dep. 32:22-33:22, ECF No. 37); Pl.'s Statement of Material Facts
in Dispute ¶ 21, ECF No. 43-1 [hereinafter Pl.'s SMF] (same).

SLPs are also responsible for performing a number of
record-keeping duties. One of their most fundamental duties is
to maintain timely, accurate, and up-to-date therapy logs which
document when therapy sessions were held and what occurred
during the session. SLPs must also maintain records indicating
that students have been properly dismissed from SLP services and
documenting when Medicaid reimbursable services have been
provided.

If an SLP anticipates being unable to meet a deadline, the
School District requires that the SLP contact Speech Language
Coordinator Amy Arnold ahead of time. Arnold is responsible for
overseeing compliance with federal and state requirements and
can provide SLPs with support to help prevent them from missing
deadlines. An SLP's failure to timely evaluate a student
suspected of having a speech or language impairment, failure to
review a student's IEP prior to the annual review deadline, or
failure to properly dismiss a student from SLP services are
procedural violations under the IDEA for which the School
District may be sanctioned by the Georgia Department of
Education or the U.S. Department of Education Office of Civil
Rights.

### III. Salser's Initial Requests for Accommodations

In 2005, Salser requested (and the School District provided) seven specific accommodations: (1) a classroom appropriate for equipment; (2) a flexible work schedule; (3) a communication link; (4) an ergonomically correct desk and chair; (5) a mid-day schedule break other than lunch; (6) storage at waist-to-chest level; and (7) assistance in setting up and breaking down classrooms. Salser Dep. Ex. 58, Letter from J. Miller to M. Salser, Nov. 7, 2005, ECF No. 21 (confirming that Salser's requests for accommodation made in her July 27, 2005 email had been fulfilled). As part of her flexible work schedule, Salser was allowed to complete paperwork from home when she was not scheduled to provide therapy to students, conduct screenings, perform eligibility evaluations, or attend IEP meetings. But, the flexible work schedule accommodation did not excuse Salser from her recordkeeping duties.

### IV. Salser's Dual School Assignment

During Salser's first five years with the School District she was assigned to Timothy Road Elementary School ("Timothy Road"). From all indications, while stationed at Timothy Road, Salser was a successful employee who was highly valued by the School District. Salser Aff. ¶ 12 (stating Salser received satisfactory evaluations for the 2001-2002, 2002-2003, 2003-2004, 2004-2005, and 2005-2006 school years); Pl.'s Resp. Ex. F,

Salser Annual Evaluation Summary Reports, ECF No. 44-1 (stating that despite "health issues," Salser is a "veteran SLP" who provides "quality services," is "flexible," is an "active participant" at department meetings, and is "well respected at her school").

At the start of the 2006-2007 school year, Salser was given a dual school assignment at Chase Street Elementary School ("Chase Street") and Coile Middle School ("Coile"). In the fall of that same year, "after months of requesting a scooter to help with [her] mobility," the School District provided Salser with a motorized scooter. Salser Aff. ¶ 6. But, according to Salser, Associate Superintendent of Student Services Dr. Mike Blake told her that the scooter was "not to leave Chase Street." *Id.*; *see also* Pl.'s Resp. Ex. D, Email from M. Blake to M. Salser, Dec. 4, 2006, ECF No. 44-1 (referring to a "scooter for use at Chase Street"). Therefore, Salser did not use the scooter at Coile. Salser again received a satisfactory evaluation for the 2006-2007 school year. Pl.'s Resp. Ex. E, Salser 2006-2007 Annual Evaluation Summary Report, Feb. 13, 2007, ECF No. 44-1. Soon, however, Salser's colleagues and supervisors began to express concerns regarding her performance.

## V. Salser's Job Performance Deteriorates

At the start of the 2007-2008 school year, Salser had a meeting with Arnold, Director of Special Education Susan Rozier,

and Coile Special Education Team Leader Heather Grace. At the meeting, Rozier expressed concerns about Salser's attendance during the 2006-2007 school year. Arnold also raised concerns about Salser's failure to communicate with her in advance of missing IEP deadlines the previous year. Salser notes, however, that her 2006-2007 performance review did not mention attendance as a problem. *Id.*

During that same meeting, Salser made Arnold, Rozier, and Grace aware that she had difficulty moving throughout the Coile building. Grace Dep. 11:24-12:12. As a result, Salser's therapy room at Coile was moved to the front office suite near a handicap accessible restroom, and she was provided with a separate, more accessible sign-in sheet. Salser was also told that she could provide the names of students who needed to meet with her for therapy to the office staff, who would then call those students to come to Salser's suite so that she did not have to escort students to and from speech therapy.

In the fall of 2007, Salser's absences began to negatively impact her productivity at work. In August 2007, Salser reported taking two days of leave out of fifteen work days. In September 2007, Salser reported taking seven-and-a-half days of leave out of nineteen work days. Five of those seven-and-a-half days were bereavement leave due to the death of Salser's father. When Salser returned to work in October 2007, she was tired,

sick, and "not in great shape." Salser Dep. 265:14-25. In October 2007, Salser reported taking two-and-a-half days of leave out of twenty-three work days.

During the same period, Salser failed to meet the deadlines for submitting her August 2007 and September 2007 Medicaid records. Also, in September 2007, Chase Street Assistant Principal Adam Kurtz began receiving complaints from teachers that students were not receiving SLP therapy services from Salser as required under their IEPs.[3] Kurtz reported these complaints to Arnold, who requested Salser's therapy logs to investigate. Salser delayed in providing the requested therapy logs and ultimately never produced therapy logs for two students who had not been properly dismissed from SLP services. Salser notified Arnold that those two students had been dismissed from SLP services; but Salser failed to timely complete and turn in appropriate paperwork.[4] Arnold Aff. ¶ 21. The absence of the therapy logs suggested to Arnold that Salser was not providing

---

[3] Salser notes that some of the complaints were received on the same day, October 3, 2007, after Kurtz asked whether students were receiving speech services. Kurtz Dep. 61:8-62:3, ECF No. 38. Kurtz explained that he asked teachers whether students were receiving speech services as part of Chase Street's full-time equivalency count which determined state funding for student services. *Id.; see also id.* at 41:1-21 (discussing full-time equivalency count). Kurtz had also previously received complaints regarding Salser the previous school year and in September 2007. *Id.* at 54:5-58:5, 62:4-63:5.

[4] Salser contends that she "provided copies of the therapy logs requested," Pl.'s SMF ¶¶ 62-64, but she did not direct the Court to any evidence supporting that assertion.

SLP services to eligible students. And, Arnold noticed discrepancies between the therapy logs Salser did produce and her reported leave. This caused Arnold to believe that Salser was not providing therapy to students and was not performing her documentation and record-keeping duties. Salser attributes the discrepancies to "a clerical error or two" in transposing her notes to her therapy logs. Salser Aff. ¶ 9.

In addition to the complaints at Chase Street, in October 2007, Grace informed Arnold that Salser had failed to write IEP speech-related goals for a number of students at Coile. Salser explains that at that time she had just returned from bereavement leave, that she was primarily working at Chase Street, and that she was often not told of meetings that were held at Coile or was told about the meetings only at the last minute. Salser Aff. ¶ 10; Salser Dep. 264:25-266:3 (explaining that Salser's father died in September 2007, that she was ill at the time, that she was "playing catch-up the entire fall," and that "yes, [Arnold] didn't get her logs when she needed them, but [Salser] was doing the best [she] could to keep up").

In October 2007, Arnold met with Salser to discuss her performance problems. Arnold emphasized the importance of communicating with her in advance of missing a deadline and directed Salser to inform Arnold if she needed assistance meeting deadlines. Arnold subsequently issued Salser three

Georgia Teacher Duties and Responsibilities Instrument ("GTDRI") written deficiency notifications for performance problems in the following areas: (1) conducts assigned classes at the times scheduled; (2) communicates effectively with families, students, and colleagues; and (3) maintains accurate, complete, and appropriate records and files reports promptly.[5] Salser Dep. Exs. 195-97, GTDRI Deficiency Notifications, Oct. 18, 2007, ECF No. 21. The GTDRI deficiency notifications directed Salser to take the following corrective actions: (1) inform her supervisor if she would not be able to meet a deadline; (2) maintain accurate therapy logs; (3) document missed therapy sessions and indicate when make-up sessions would be held; (4) clarify discrepancies between therapy logs and reported leave; and (5) send in Medicaid records for the previous month by the 5th of the following month. *Id.*

In response to the deficiency notifications, Salser improved in some areas. Arnold Dep. 60:12-22, ECF No. 34; *see* Salser Dep. Ex. 146, Email from A. Arnold to M. Salser, Nov. 6, 2007 (telling Salser "You've really been doing awesome. It hasn't gone unnoticed!" in response to Salser sending in October Medicaid records by November 5th). But, in other areas, Salser had additional problems. Arnold Dep. 60:23-24. First,

---

[5] The GTDRI is an evaluation instrument developed by the Georgia Department of Education as part of the Georgia Teacher Evaluation Program ("GTEP").

despite Arnold's directives, Salser failed to clarify discrepancies between her therapy logs and her reported leave. Arnold Aff. ¶ 26. Second, after failing to complete a student's evaluation before a scheduled IEP meeting, Salser failed to follow Arnold's instruction to convene a second IEP meeting to review Salser's evaluation of the student. Arnold Aff. ¶¶ 27-28. Third, Salser claimed she was not providing therapy to a student because the student had been dismissed from SLP services, but she failed to produce any dismissal paperwork, and Arnold later learned that the student was still receiving SLP services through the School District. Arnold Aff. ¶ 29; Salser Dep. Ex. 141, Email from L. Andrews to M. Salser & H. Grace, Oct. 30, 2007, ECF No. 21. Finally, Salser failed to submit her pre-K screening data by the October 31, 2007 deadline and failed to inform Arnold that she anticipated not being able to meet that deadline.[6] Arnold Aff. ¶¶ 30-31; *see also* Arnold Dep. 61:14-62:10 (stating that missing the deadline was "not the issue as much as letting [Arnold] know so that [she could] provide the support to prevent missing the deadline").

In November 2007, Salser reported taking three-and-a-half days of leave out of nineteen work days. That same month, the

---

[6] During the 2006-2007 school year Salser claimed that she was unable to conduct pre-K screenings by the October 31 deadline because she "had no way to get down to the classroom to do it." Salser Dep. 229:1-5. But by the 2007-2008 school year, the School District had provided Salser with a scooter to help her get around the building.

School District's data compliance specialist informed Arnold that IEPs for five of Salser's students were out of compliance because paperwork had not been submitted indicating that the students' IEP meetings had been held by their annual review deadlines. Salser failed to communicate with Arnold in advance of missing the annual review deadlines for the five students, or otherwise inform Arnold that she needed assistance conducting annual reviews.

In December 2007, Salser reported taking one day of leave out of fourteen work days. And, on December 5, 2007, Salser did not provide SLP services at Coile because she could not "move very much." Salser Dep. Ex. 161, Email from M. Salser to H. Grace & A. Arnold, Dec. 5, 2007, ECF No. 21. On December 20, 2007, Arnold issued Salser a fourth GTDRI deficiency notification for failing to communicate in advance of missing an evaluation deadline. In that deficiency notification Arnold stated that she "understood that [Salser's] absences created a very difficult situation for achieving this deadline," but further explained that she was "concerned that [Salser] did not communicate to [Arnold] that this was going to be late so that possibly [Arnold] could have helped make this happen." Arnold Aff. Ex. E, GTDRI Deficiency Notification, Dec. 20, 2007, ECF No. 40-4. Arnold further explained that "[t]he state has

left no room for error in meeting timelines. Our goal and mandate is to be at 100%." *Id.*

On January 11, 2008, Salser sent an e-mail to Blake and Assistant Superintendent of Human Resources Bud Bierly, requesting "a single school assignment in a building that is ADA compliant." Salser Dep. Ex. 176, Letter via Email from M. Salser to R. Bierly & M. Blake, Jan. 11, 2008, ECF No. 21. That same day Bierly responded to Salser's email and asked that he, Blake, and Salser meet "in the very near future to discuss issues [Salser] addressed." Salser Dep. Ex. 177, Email from R. Bierly to M. Salser & M. Blake, Jan. 11, 2008, ECF No. 21. That meeting, however, did not occur. Shortly after sending her January 11 email, Salser contracted tuberculosis and became unable to work.

On January 17, 2008, Arnold informed Salser that one of her files was being reviewed in connection with a Medicaid audit and Arnold noticed that the file did not include required report card data for the 2006-2007 school year. Arnold Aff. Ex. H., Email from A. Arnold to M. Salser, Jan. 17, 2008, ECF No. 40-4. In response, Salser told Arnold "I'll get it to you." Arnold Aff. Ex. H., Email from M. Salser to A. Arnold, Jan. 17, 2008, ECF No. 40-4. Salser, however, did not provide the report card data to Arnold. Arnold Aff. ¶ 37. After January 18, 2008, Salser stopped responding to Arnold's emails and did not return

her phone calls. *Id.* ¶ 38. For the rest of January, Arnold did not know why Salser was absent from work, did not have any information about her medical condition, and did not know that Salser anticipated being absent on a continuous or long-term basis. *Id.* ¶ 40. On January 24, 2008, Arnold emailed Salser because the file Salser had delivered to Arnold for the Medicaid audit was incomplete and did not include the essential report card data. Arnold Aff. ¶ 41. In the email, Arnold offered to help Salser look for the missing data and asked whether Salser was available to meet the following week. Arnold Aff. Ex. N, Email from A. Arnold to M. Salser, Jan. 24, 2008, ECF No. 40-4. Salser did not respond to Arnold's offer of assistance, and she never provided Arnold with the report card data. Arnold Aff. ¶ 41. Likewise, after Salser signed in to Coile on January 28, 2008, Arnold sent her an e-mail asking whether she had returned to work, but Salser did not respond. Arnold Aff. ¶¶ 44-45; Arnold Aff. Ex. Q, Email from A. Arnold to M. Salser, Jan. 28, 2008, ECF No. 40-4. Arnold also continued to receive information from School District personnel regarding problems with Salser's caseload. Arnold Aff. ¶ 43; Arnold Aff. Ex. O, Emails Between J. Semonsky & A. Arnold, Jan. 24, 2008- Jan. 25, 2008, ECF No. 40-4 (discussing Coile student who was supposed to receive SLP services whose file showed no evidence of receiving SLP services). Finally, on February 4, 2008,

Salser sent an e-mail to Arnold, Blake, and Bierly stating that
she had been diagnosed with latent tuberculosis and, due to side
effects from medication for that condition, she was unable to
work.[7] Arnold Aff. Ex. R, Email from M. Salser to A. Arnold, M.
Blake, & R. Bierly, Feb. 4, 2008, ECF No. 40-4.

Arnold assumed that once Salser was no longer suffering
from the side effects of her medication, she would return to
work. Therefore, in anticipation of her return, Arnold
continued to review and evaluate Salser's performance prior to
the April 15th annual performance evaluation deadline. Arnold
Aff. ¶ 47; *see also* Bierly Aff. ¶ 13 ("Annual evaluations are
generally completed by April 1st of each year, but never later
than April 15th."). During her continued review of Salser's
therapy logs, Arnold discovered that Salser had conducted seven
therapy sessions with a student before obtaining parental
consent to provide special education services and had failed to

_____

[7] According to Salser, she had contracted tuberculosis by
January 11, 2008, and was out of work on approved FMLA leave as of
January 17, 2008. Pl.'s SMF ¶¶ 108-112, 113, 114, 119. But, as
discussed above, Salser did not make anyone at the School District
aware of her tuberculosis diagnosis until February 4, 2008. The
School District approved Salser's FMLA leave on February 11, 2008 and,
only then, made Salser's FMLA leave retroactive to January 18, 2008.
Bierly Aff. Ex. E, FMLA Leave Approval Notification, Feb. 11, 2008,
ECF No. 40-3. Therefore, prior to February 4, 2008, the School
District did not know why Salser was absent from work and did not have
any information about her medical condition. *E.g.*, Bierly Aff. ¶ 15
("Prior to February 4, 2008, I was not aware that Salser was suffering
from a serious health condition which might qualify her for leave
under the Family Medical Leave Act ('FMLA')."); *accord* Arnold Aff. ¶
46.

complete accurate IEP and eligibility records for thirteen of
the eighteen students she was responsible for serving at Coile.
Arnold Aff. ¶ 48. Upon completing her review of Salser's
therapy logs, Arnold decided it would be necessary to provide
Salser with a fifth GTDRI deficiency notification, issue her an
"unsatisfactory" annual performance evaluation, and place her on
a professional development plan ("PDP") for the upcoming school
year. Arnold Aff. ¶ 49; *see also* Arnold Aff. Ex. S, CCSD
Notification & Documentation Record 5, Mar. 28, 2008, ECF No.
40-4 (documenting deficiencies, including fifth deficiency
notification related to Arnold's continued review of Salser's
therapy logs).

Arnold began drafting Salser's PDP in March 2008, and was
still working on it a day or two before the April 15th deadline.
Arnold Aff. ¶ 50. Because Salser had not responded to e-mails
and was unavailable to meet with Arnold to receive and discuss
her evaluation in person, Arnold was concerned that Salser might
not receive her annual evaluation by the April 15th deadline.
Arnold Aff. ¶ 51. Therefore, Arnold instructed a School
Resource Officer ("SRO") to deliver Salser's annual performance
evaluation, PDP, and 2008-2009 school year contract to her at
home.[8] *Id.*; Salser Aff. ¶ 13. When the SRO arrived at Salser's

[8] A School Resource Officer is a police officer hired by the School
District. Salser Aff. ¶ 13; Arnold Dep. 92:16-23.

home, he announced that he was delivering something from human resources. Salser Dep. 294:19-295:1. Salser looked at it and said, "I don't know what that is or what it says but I don't want it." *Id.* at 295:1-3. She shut the door and the SRO left. *Id.* at 295:3-4. When the SRO made a second attempt to deliver Salser's performance evaluation, PDP, and contract, she refused to answer her door. *Id.* at 295:5-7. The SRO placed the package in her door and left. *Id.* at 295:7-8.

Salser's contract for the 2008-2009 school year indicated that she had received her "step increase," meaning that she had received full credit for another year of teaching experience and had advanced on the salary scale. Bierly Aff. ¶ 19. Salser's unsatisfactory annual performance evaluation did not impact her ability to advance on the salary scale or receive her step increase. Bierly Aff. ¶ 19.

## VI. Salser's Leave and Benefits

After receiving Salser's e-mail informing him that she had contracted tuberculosis, Bierly sent Salser written notification that she was approved for FMLA leave and, as of February 4, 2008, she had fifty one days of FMLA leave remaining. Bierly Aff. Ex. E, FMLA Leave Approval Notification, Feb. 11, 2008, ECF No. 40-3. Salser's absences from January 18, 2008 through February 4, 2008 were retroactively designated as FMLA leave days. *Id.* Salser took sixty days of

FMLA leave on a continuous basis from January 18, 2008 through April 24, 2008. Throughout the duration of Salser's FMLA leave, Defendants maintained her health insurance benefits the same as if she had continued working. Salser was inadvertently continued in FMLA leave status between April 25, 2008 and May 23, 2008, the last day of school for the 2007-2008 school year.

Salser filed an Equal Employment Opportunity Commission ("EEOC") charge of discrimination ("Charge") on April 1, 2008. Salser Dep. Ex. 191, Charge of Discrimination, Apr. 1, 2008, ECF No. 21. The School District was notified of Salser's Charge on April 7, 2008. Bierly Aff. Ex. F, Letter from EEOC to the School District, Apr. 7, 2008, ECF No. 40-3.

Upon learning that Salser's FMLA leave had been exhausted, Bierly informed her that she was expected to return to work on July 31, 2008 or, if unable to do so, she could petition Superintendent James Simms for an extended leave of absence. Salser Dep. Ex. 20, Letter from R. Bierly to M. Salser, July 18, 2008, ECF No. 21. On July 23, 2008, Salser requested and was granted an extension of leave without pay through April 1, 2009. Salser Dep. Ex. 19, Letter from M. Salser to J. Simms, July 23, 2008, ECF No. 21; Salser Dep. Ex. 21, Letter from J. Simms to M. Salser, July 31, 2008, ECF No. 21.

On March 30, 2009, two days before the extension of Salser's leave was going to end, she sent Simms a letter requesting an additional extension of her leave of absence until August 2009. Salser Dep. Ex. 24, Letter from M. Salser to J. Simms, Mar. 30, 2009, ECF No. 21. On April 6, 2009, Simms sent Salser a letter of non-renewal because, at the time he sent the letter, Simms was unaware that Salser had requested an additional extension of leave. Simms Dep. 22:6-23:7; Salser Dep. Ex. 25, Letter from J. Simms to M. Salser, Apr. 6, 2009, ECF No. 21. Simms testified that if he had known of Salser's request for an additional extension of her leave, he would not have sent the letter of non-renewal. Simms Dep. 22:6-24:2. Consistent with that testimony, once Simms learned of Salser's request, he rescinded the April 6th letter of non-renewal before it took effect, granted Salser's request for an extension of her leave of absence, and sent her a contract for the 2009-2010 school year. Salser Dep. Ex. 26, Letter from J. Simms to M. Salser, June 16, 2009, ECF No. 21.

While Salser was in leave without pay status she was responsible for paying her own health insurance premiums directly to the Georgia Department of Community Health State Health Benefit Plan ("SHBP"). SHBP is responsible for administering health insurance benefits for employees of local school districts. Salser's health insurance coverage was

continued during her period of leave without pay pursuant to the terms of a request which was submitted to SHBP. Salser Dep. Ex. 22, SHBP Request to Continue Health Benefits During Leave of Absence Without Pay, Oct. 28, 2008, ECF No. 21. Salser's SHBP request indicated that she had been granted approved leave through April 2009. *Id.* (indicating authorized leave ended on April 30, 2009). SHBP continued Salser's coverage for one additional month beyond her period of approved leave and then terminated her insurance benefits after May 31, 2009. Salser Dep. Ex. 5, SHBP Invoice, Apr. 6, 2009, ECF No. 21 ("Our records show that this approved period expires on May 31, 2009. To be eligible for coverage beyond the coverage billed above, you must return to work or request a coverage extension . . . ."); *accord* Salser Dep. Ex. 6, Certificate of Group Health Plan Coverage, June 8, 2009, ECF No. 21. As discussed above, Salser requested an additional extension of her leave of absence on March 30, 2009 and Simms granted Salser's request on June 16, 2009. But there is no evidence that Salser or the School District made SHBP aware of the extension at that time. Salser subsequently emailed School District Benefits Coordinator Darlene Nicklow on July 1, 2009 and informed her that her insurance had been terminated and that she had not received a bill for June or July. Salser Dep. Ex. 8, Email from M. Salser to D. Nicklow, July 1, 2009, ECF No. 21. Prior to Salser's

email, Nicklow was unaware that Salser's health insurance had been terminated by SHBP. *See* Salser Dep. 53:10-11 (stating Nicklow "was not aware that [Salser] wasn't getting the bills"); *see also* Salser Dep. Ex. 8, Email from D. Nicklow to M. Salser, July 1, 2009, ECF No. 21 (telling Salser regarding her health insurance that "[o]nce you are on direct bill, I do not do anything with it"). The same day Salser informed Nicklow that her health insurance had been terminated, Nicklow contacted SHBP and had Salser's health insurance reinstated retroactive to May 31, 2009. Salser Dep. 60:3-61:11; *see also* Salser Dep. Ex. 10, Email from D. Nicklow to M. Salser, July 1, 2009, ECF No. 21 (explaining to Salser why her health insurance had been terminated, that Nicklow had sent SHBP a request to extend Salser's health insurance through August 31, 2009, and that Salser would need to send SHBP any premiums she had not paid); Salser Dep. Ex. 12, SHBP Invoice, July 7, 2009, ECF No. 21 (billing Salser $753.40 for June, July, and August 2009 premiums). Salser elected not to continue her health insurance coverage through SHBP. Salser Dep. 61:12-62:10.

Salser has not returned to work and she remains out of work on leave without pay. Salser Dep. 69:17-70:9.

## VII. Access to Chase Street Elementary School

During the 2006-2007 school year and the first half of the 2007-2008 school year, the students and faculty of Chase Street

were temporarily housed at the former Gaines School Road Elementary School while Chase Street was being renovated. Faculty and staff moved into the newly renovated Chase Street building during the 2007-2008 winter break. The facade and front structure of the original Chase Street Elementary School was left intact and incorporated into the renovated building. There are steps which go up to the main entrance of the building, but no handicap accessible ramp. The side entrances to the building are at grade level and are flanked on the north and south sides by two parking lots, both of which contain handicapped parking spaces. Staff enter through the grade level entrances along the side of the building by using an electronic tag to unlock the doors.

On January 7, 2008, employees were required to report to work at the newly renovated Chase Street building. At that time, faculty and staff did not have keys to the new building because the electronic tags had not come in. Employees entered the building through unlocked doors at the main entrance to the school. The doors to the side entrances of the building remained locked. To enter through the side doors, it was necessary to call the main office and have someone manually open the door. When Salser called the office, no one answered because everyone was in a faculty meeting. The following day, Salser was able to enter the building without incident. She

called the office and someone brought her scooter to her at the side entrance. Salser was also issued a key that same day, in advance of the arrival of the electronic keys for other employees. Salser subsequently got to her classroom by parking her scooter near the grade-level side entrance at the end of each day. When she came into the building the following morning, she would ride her scooter to her classroom.

DISCUSSION

Salser contends that Defendants discriminated against her in violation of the ADA by failing to provide her with reasonable accommodations. Salser also claims that Defendants interfered with her rights under the FMLA. Finally, Salser contends that Defendants retaliated against her for her requests for reasonable accommodations under the ADA and for her use of FMLA leave. For the following reasons, the Court finds that Defendants are entitled to summary judgment as to each of Salser's claims.

## I. Individual Capacity Claims

As a preliminary matter, the Court finds that Defendants sued in their individual capacity are entitled to summary judgment as to Salser's ADA discrimination and retaliation claims. The Eleventh Circuit Court of Appeals has held that "individual defendants are not amenable to private suit for violating the antidiscrimination provision of Subchapter I of

the ADA." *Albra v. Advan, Inc.*, 490 F.3d 826, 830 (11th Cir. 2007) (per curiam). The Eleventh Circuit has also held that "individuals are not amenable to private suit for violating the ADA's anti-retaliation provision, 42 U.S.C. § 12203, where the act or practice opposed by the plaintiff is made unlawful by the ADA provisions concerning employment, 42 U.S.C. §§ 12111-12117." *Id.* at 828. Therefore, the Court finds that Defendants Bonnie E. Jackson, James H. Simms, Jean Miller, Robert Bierly, Adam Kurtz, and Amy Arnold are entitled to summary judgment as to Salser's ADA discrimination and retaliation claims against them in their individual capacity.[9]

The Court also finds that Defendants sued in their individual capacity are entitled to summary judgment as to Salser's FMLA claims. The Eleventh Circuit has held that "a public official sued in his or her individual capacity is not an 'employer' under the FMLA, and therefore there is no federal subject matter jurisdiction over such a claim." *Wascura v. Carver*, 169 F.3d 683, 687 (11th Cir. 1999). Therefore, the Court finds that Defendants Bonnie E. Jackson, James H. Simms, Jean Miller, Robert Bierly, Adam Kurtz, and Amy Arnold are entitled to summary judgment as to Salser's FMLA claims against them in their individual capacity.

---

[9] Salser sued Defendant Philip D. Lanoue in his official capacity only.

Finally, the Court construes Salser's official capacity claims against Philip D. Lanoue, Bonnie E. Jackson, James H. Simms, Jean Miller, Robert Bierly, Adam Kurtz, and Amy Arnold as claims against the School District. *See Smith v. Allen*, 502 F.3d 1255, 1271 (11th Cir. 2007) ("[A]n official capacity suit is, essentially, pleading an action against the entity of which an officer is an agent.") (internal quotation marks omitted), *abrogated on other grounds by Sossamon v. Texas*, 131 S. Ct. 1651 (2011).

## II. Salser's ADA Discrimination Claims

The ADA provides that no covered employer shall discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (effective to Dec. 31, 2008).[10] "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her

---

[10] Because all of Salser's discrimination claims are based on the School District's actions that occurred prior to January 1, 2009, the Court analyzes her claims under the ADA as it existed prior to January 1, 2009. *Fikes v. Wal-Mart, Inc.*, 322 F. App'x 882, 883 n.1 (11th Cir. 2009) (per curiam) (applying pre-2009 ADA because there was no expression of congressional intent for the amendments to apply retroactively).

disability."[11]  *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); *accord Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).

It is undisputed that Salser is disabled within the meaning of the ADA.  Salser contends that the School District discriminated against her on the basis of her disability by failing to provide reasonable accommodations as required by the ADA.[12]  *Lucas*, 257 F.3d at 1255 ("An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability-unless doing so would impose undue hardship on the employer." (citing 42 U.S.C. § 12112(b)(5)(A) (effective to Dec. 31, 2008) & 29 C.F.R. § 1630.9(a) (effective to May 23, 2011))).  The School District responds that Salser was not a "qualified individual" within the meaning of the ADA because she was unable to perform the essential functions of her job with or without reasonable accommodations.

---

[11] "The burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims."  *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000).

[12] Salser makes passing references to a hostile work environment in her Amended Complaint and in response to Defendants' motion for summary judgment.  Pl.'s Am. Compl. ¶ 9, ECF No. 26; Pl.'s Br. 6.  As the Court explained in its Order granting Defendants' motion for partial summary judgment, "[d]enial of a reasonable accommodation for a disability is . . . a discrete act of discrimination" and "[e]ven allegations of a 'pattern' of discrete acts cannot be brought under a hostile work environment theory."  *Salser v. Clarke Cnty. Sch. Dist.*, No. 3:10-CV-17 (CDL), 2011 WL 56064, at *3 (M.D. Ga. Jan. 5, 2011).

"An individual is 'qualified' if she, with or without reasonable accommodation, can perform the essential functions and job requirements of the position the individual holds." *Earl*, 207 F.3d at 1365 (citing 42 U.S.C. § 12111(8) (effective to Dec. 31, 2008)). "An employer must provide reasonable accommodations for employees with known disabilities unless such accommodations would result in undue hardship to the employer." *Id.* "An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job." *Id.*; *Lucas*, 257 F.3d at 1255. "[W]hat is reasonable for each individual employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation." *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997).

Here, it is undisputed that the essential functions of an SLP include: (1) providing therapy to students; (2) evaluating students for speech disabilities; (3) maintaining accurate, complete, and correct records; and (4) communicating with SLP coordinator Amy Arnold.[13]   SLP Job Description 1 (defining

---

[13] "Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." *Lucas*, 257 F.3d at 1258.  In conducting this inquiry, "consideration shall be given to the employer's judgment . . . and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Earl*, 207 F.3d at 1365 (quoting 42 U.S.C. § 12111(8) (effective to Dec. 31, 2008)).  "A job function also may be essential if there are a limited number of

"nature of work" as "[d]iagnose and treat pre-school and school-
aged children through high school with various communications
disabilities" and listing other "essential functions" including
communicating with SLP coordinator and maintaining accurate,
complete, and correct records).  It is also undisputed that at
times Salser was unable to perform the essential functions of
her SLP position, even with the accommodations the School
District provided.   Salser contends, however, that any
difficulty she had performing the essential functions of her
position were the direct result of the School District's failure
to provide her with additional reasonable accommodations.  *E.g.*,
Pl.'s Br. 6 ("[Salser's] situation with performance became an
issue only after she was moved to work in two schools, with a
lack of support staff."); *accord id.* at 4, 8-9.   More
specifically, Salser identifies two accommodations not provided
that she contends would have allowed her to perform the
essential functions of her SLP position: (1) a single school
assignment, *e.g.*, *id.* at 10; and (2) assistance from her
supervisor, Amy Arnold, in performing her SLP duties, *e.g. id.*
("Amy Arnold was qualified to handle SLP duties and could have
assisted Ms. Salser."); *accord id.* at 8-9; *see also* Pl.'s SMF ¶

---

employees among whom performance of the job can be distributed."  *Id.*
(citing 29 C.F.R. § 1630.2(n)(2)(ii) (effective to May 23, 2011)).

21 ("[O]thers could have filled in for Mary Lee Salser to have [IEP] meetings completed.").

## A.    Single School Assignment

The School District was not required to provide Salser with a single-school assignment because she did not request any accommodation for her dual-school assignment until a week before she became completely unable to work.  The Eleventh Circuit has held that "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (per curiam).  Moreover, the EEOC's interpretative guidelines, issued pursuant to the ADA, provide that "[i]n general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. pt. 1630 App. § 1630.9 (effective to May 23, 2011).[14]  "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." *Id.*

Salser contends that she "complained that the transfer to two schools . . . and her having to serve students at both schools simultaneously put additional stains on her from a

---

[14] As explained above, the Court analyzes Salser's claims under the ADA as it existed prior to January 1, 2009.

mobility standpoint and made the demands of the job more difficult physically."[15]  Pl.'s Br. 9-10 (citing Salser Aff. ¶ 11 ("Having been transferred from one school for my responsibilities to two schools put more of a strain on my physical well-being . . . .  I advised my supervisors that having two schools to go between was more difficult for me.")). But Salser's vague complaints are not the type of "specific demand for an accommodation" required to trigger the duty to provide a reasonable accommodation.  *Gaston*, 167 F.3d at 1363. Although the Eleventh Circuit had previously not "determined precisely what form the request [for reasonable accommodation] must take," *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1261 n.14 (11th Cir. 2007), it recently indicated that "for a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant 'must have enough information to know of *both* the disability *and desire for an*

---

[15] Salser's affidavit does not specify when or to whom she registered her complaints about her dual-school assignment.  The Court's own review of the record revealed only one complaint: an August 16, 2006 email from Salser to the School District's Director of Human Resources Jean Miller in which Salser stated that "the fact that I have been moved to a school farther away from my home and given a second site places great stress on me.  It is difficult to move between the sites and fulfill my responsibilities."  Salser Dep. Ex. 81, Email from M. Salser to J. Miller, Aug. 16, 2006, ECF No. 21.  In addition to being beyond the time period relevant to this action, *see Salser v. Clarke Cnty. Sch. Dist.*, No. 3:10-CV-17 (CDL), 2011 WL 56064 (M.D. Ga. Jan. 5, 2011) (dismissing Salser's ADA claims based on acts and omissions that occurred prior to October 4, 2007), Salser's August 16, 2006 complaint is not the type of "specific demand for an accommodation" required to trigger the duty to provide a reasonable accommodation, *Gaston*, 167 F.3d at 1363.

*accommodation*, or circumstances must at least be sufficient to cause a reasonable [employer] to make appropriate inquiries about the possible need for an accommodation,'" *United States v. Hialeah Hous. Auth.*, No. 10-12838, 2011 WL 989815, at *3 (11th Cir. Mar. 22, 2011) (per curiam) (emphasis added) (quoting *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (quotation marks omitted)) (discussing requirements for ADA reasonable accommodation demand in Fair Housing Act case). Here, it is undisputed that the School District knew of Salser's disability. But Salser has not directed the Court to any evidence that she requested an accommodation for her dual-school assignment. Further, there is no indication that Salser's dual-school assignment so obviously required accommodation that there was no need for her to make a request. As Salser points out, she worked the full 2006-2007 school year at both Chase Street and Coile, and received a satisfactory evaluation at the end of the year.

Salser has produced no evidence that she made any request for accommodation related to her dual-school assignment prior to January 11, 2008, when she "formally request[ed] a single school assignment in a building that is ADA compliant." Salser Dep. Ex. 176, Letter via Email from M. Salser to R. Bierly & M. Blake, Jan. 11, 2008, ECF No. 21. By then, Salser had become infected with tuberculosis and, within a week, was completely

unable to work. *See* Bierly Aff. ¶ 17 (stating Salser's absences after Jan. 18, 2008 were retroactively designated FMLA leave); *accord* Pl.'s SMF ¶¶ 108-112. At that point, a single school assignment would not have enabled Salser to perform the essential functions of her SLP position. Therefore, the Court finds that the School District did not discriminate against Salser by failing to provide an accommodation for her dual-school assignment that she did not ask for until it was too late to help her. *Earl*, 207 F.3d at 1365 ("An accommodation is reasonable, and thus required under the ADA, only if it allows the employee to perform the essential functions of the job.").

### B.  Reallocation of Essential Job Duties

The School District was also not required to reallocate Salser's job functions to her supervisor and others when she was unable to perform them because there is no evidence that Salser requested such an accommodation. Salser now contends that her supervisor, Speech Language Coordinator Amy Arnold, "was qualified to handle SLP duties and could have assisted Ms. Salser." Pl.'s Br. 10; *accord id.* at 8-9; *see also* Pl.'s SMF ¶ 21 ("[O]thers could have filled in for Mary Lee Salser to have [IEP] meetings completed."). But Salser has not directed the Court to any evidence that she ever requested assistance performing her SLP duties. To the contrary, the undisputed evidence shows that Arnold directed Salser, on multiple

occasions, to inform her if she needed assistance. *See* Arnold Aff. ¶¶ 25, 30 (discussing Arnold's offers of assistance); Arnold Aff. Ex. C, Email from A. Arnold to M. Salser, Nov. 16, 2007, ECF No. 40-4 ("If you need help, please let me know."); Salser Dep. Ex. 196, GTDRI Deficiency Notification, Oct. 18, 2007, ECF No. 21 (directing Salser to communicate with Arnold in advance if unable to complete assigned task by deadline). And Salser has not directed the Court to any evidence that she ever accepted Arnold's offers of assistance or otherwise sought assistance from Arnold or anyone else. *See* Arnold Aff. ¶¶ 30-31, 33-34 (chronicling Salser's failure to communicate with Arnold in advance of missing multiple deadlines). Therefore, the Court finds that the School District did not discriminate against Salser by failing to provide her with the assistance performing her SLP duties that the undisputed evidence shows she did not ask for. *See Gaston*, 167 F.3d at 1363 ("[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."); 29 C.F.R. pt. 1630 App. § 1630.9 (effective to May 23, 2011) ("In general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.").

Further, even if Salser had requested assistance in performing her SLP duties, the School District was not required

to have Arnold do Salser's job for her. The ADA does not require an employer to reallocate job duties to change the essential functions of a job. *See Holbrook*, 112 F.3d at 1527-28 (holding that the ADA did not require a police department to accommodate a disabled detective—who was unable to drive an automobile or collect certain kinds of evidence—with a "minor shuffling of case assignments"). As explained in federal regulations promulgated pursuant to the ADA,

> [a]n employer or other covered entity may restructure a job by reallocating or redistributing nonessential, marginal job functions . . . . An employer or other covered entity is not required to reallocate essential functions. The essential functions are by definition those that the individual who holds the job would have to perform, with or without reasonable accommodation, in order to be considered qualified for the position.

29 C.F.R. pt. 1630 App. § 1630.2(o) (effective to May 23, 2011); *accord Holbrook*, 112 F.3d at 1527-28. Here, it is undisputed that the essential functions of Salser's SLP position included: (1) providing therapy to students; (2) evaluating students for speech disabilities; and (3) maintaining accurate, complete, and correct records. SLP Job Description 1. Salser suggests that the School District should have accommodated her disability by having Arnold perform those essential functions for her. Pl.'s Br. 8-9 (suggesting Arnold should have completed Salser's IEPs for her); *id.* at 10 (suggesting Arnold should have completed Salser's "SLP duties");

*see also* Pl.'s SMF ¶ 21 ("[O]thers could have filled in for Mary Lee Salser to have [IEP] meetings completed.").[16]  But since the ADA does not require an employer to reallocate a disabled employee's essential job functions, the Court finds that the School District was not required to have Arnold complete Salser's essential job functions for her.  *Holbrook*, 112 F.3d at 1527-28.

C.    Summary

In summary, the Court finds that the School District did not discriminate against Salser by failing to provide an accommodation for her dual-school assignment that she did not ask for until it was too late to help her.  The Court also finds that the School District did not discriminate against Salser by failing to reallocate the essential functions of her SLP position to other employees, an accommodation that Salser never

_____

[16] Salser also notes that while she was at Timothy Road Elementary she had assistance from another employee in "getting paperwork done." Pl.'s Br. 4.  But after her move to Chase Street and Coile, Salser contends that she "did not have the help from support staff, which was reflected in complaints she began to receive about paperwork getting done."  *Id.*  Although Salser does not specify the nature of the "paperwork," it is undisputed that one of her essential job functions as an SLP was to maintain accurate, complete, and correct records. SLP Job Description 1.  Therefore, to the extent the School District previously went beyond what the ADA required and provided her with assistance in performing that essential function, it was not required to continue doing so.  *See Lucas*, 257 F.3d at 1257 n.3 ("[A]n employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so."); *Holbrook*, 112 F.3d at 1528 (holding that city's decision to cease previously-provided accommodation, that exceeded requirements of ADA because it related to essential function of plaintiff's job, did not violate ADA).

requested and that the ADA does not require.  Accordingly, the Court finds that the School District is entitled to summary judgment on Salser's ADA discrimination claims.

## III. Salser's **FMLA Interference Claim**[17]

Salser's FMLA interference claims fail as a matter of law because she has produced no evidence that she was denied any benefit she was entitled to under the FMLA.  "To prove FMLA interference, an employee must demonstrate that [she] was denied a benefit to which [she] was entitled under the FMLA." *Martin v. Brevard Cnty. Pub. Schs.*, 543 F.3d 1261, 1266-67 (11th Cir. 2008).  Under the FMLA, an eligible employee is "entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The employer is required to maintain the employee's healthcare coverage while she is on FMLA leave.  29 U.S.C. § 2614(c); 29 C.F.R. § 825.100(b).

---

[17] The Eleventh Circuit has recognized two types of FMLA claims: (1) interference; and (2) retaliation.  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006).  It is not clear whether Salser asserts claims for FMLA interference, retaliation, or both.  *Compare* Compl. ¶¶ 72-75, ECF No. 1 (alleging FMLA interference) *with* Pl.'s Br. 11-13 (framing FMLA claims in terms of retaliation).  Out of an abundance of caution, the Court will address any FMLA interference claims here, and any FMLA retaliation claims below.

Here, the undisputed evidence shows that the School District did not deny Salser any benefit she was entitled to under the FMLA. Salser first notified the School District that she was suffering from a serious health condition which might qualify her for FMLA leave—tuberculosis—on February 4, 2008. Arnold Aff. ¶ 46. A week later, Bierly sent Salser written notification that she had been approved for FMLA leave and that her absences from January 18, 2008 through February 4, 2008 were retroactively designated as FMLA leave days. Bierly Aff. ¶¶ 16-17. Salser was provided with twelve full weeks of FMLA leave, beginning January 18, 2008. *Id.* ¶ 20. The School District also paid Salser's healthcare premiums and maintained her health insurance benefits as if she had continued to work during the duration of her FMLA leave. *Id.* ¶ 21. Salser's FMLA leave period expired before she was able to return to work. *Id.* ¶ 22; Salser Dep. Ex. 20, Letter from R. Bierly to M. Salser, July 18, 2008, ECF No. 21. Therefore, Salser's FMLA interference claim fails as a matter of law because she has produced no evidence that she was denied any benefit she was entitled to under the FMLA.

## IV. Salser's Retaliation Claims

Salser contends that the School District retaliated against her for her requests for reasonable accommodations under the ADA and for her use of FMLA leave. Salser claims that the School

District retaliated against her in the following ways: (1) issuing her an unsatisfactory annual performance evaluation in April 2008; (2) delivering the unsatisfactory annual performance evaluation via an SRO in April 2008, while she was out on FMLA leave; (3) issuing her a contract non-renewal letter in April 2009; and (4) terminating her healthcare coverage in May 2009.[18]

Where, as here, a plaintiff presents no direct evidence of retaliatory intent, the plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *E.g., Crawford v. Carroll*, 529 F.3d 961, 975-76 (11th Cir. 2008); *see also Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (noting that ADA retaliation claims are assessed under the same framework as Title VII retaliation claims); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (applying *McDonnell Douglas* burden-shifting framework to FMLA retaliation claims). To establish a prima facie case of retaliation, a plaintiff must show that she (1) engaged in statutorily

---

[18] Salser's Complaint also alleges that the School District retaliated against her by failing to answer her questions regarding a fire evacuation plan at Chase Street. Compl. ¶¶ 41-42. Salser failed to address this claim in response to Defendants' motion for summary judgment. *See generally*, Pl.'s Br. Therefore, the Court deems this claim abandoned. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

protected activity; (2) suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity. *E.g.*, *Hulbert*, 439 F.3d at 1297. If the plaintiff establishes a prima facie case of retaliation, then the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the challenged employment action. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). "If the employer offers such legitimate reasons for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Crawford*, 529 F.3d at 976 (internal quotation marks omitted).

The Court assumes for purposes of summary judgment that Salser has established a prima facie case of retaliation based on the alleged retaliatory acts. The School District, however, has articulated a legitimate, non-retaliatory reason for each of those challenged employment actions and Salser has produced no evidence of pretext. Therefore, the Court finds that the School District is entitled to summary judgment on Salser's retaliation claims.

## A.   Unsatisfactory Annual Performance Evaluation

First, Salser contends that her 2007-2008 unsatisfactory annual performance evaluation was retaliatory. The School District, however, points to Salser's failure to communicate with her supervisor Amy Arnold as a legitimate, non-retaliatory

reason for Salser's unsatisfactory evaluation. The undisputed evidence shows that Salser failed to communicate with Arnold and others during the 2007-2008 school year. For example, Salser failed to produce therapy logs when Arnold asked for them and failed to clarify discrepancies between her therapy logs and her reported leave. Despite being provided with a scooter at Chase Street to aid her mobility, Salser also failed to complete pre-K screenings by the October 31, 2007 deadline, and failed to inform Arnold that she needed assistance. And, after being directed to inform Arnold if she was going to miss a deadline, Salser failed to communicate with Arnold in advance of missing the IEP annual review deadline for five students. Finally, although Salser was required to inform Arnold if she was going to be absent for two or more consecutive days, Salser failed to notify Arnold until February 4, 2008 that she had not reported for duty at either of her assigned schools since January 17, 2008. In response, Salser has failed to produce any evidence that the School District's legitimate, non-retaliatory reason for issuing her an unsatisfactory evaluation—her failure to communicate with Arnold—was pretext for retaliation. Therefore, the School District is entitled to summary judgment on Salser's claim that her 2007-2008 unsatisfactory annual performance evaluation was retaliatory.

B.   Evaluation Delivery

Salser also argues that the delivery of her unsatisfactory annual performance evaluation to her home by an SRO, in April 2008, while she was on FMLA leave, was retaliatory.   But the School District has articulated legitimate, non-retaliatory reasons for both the timing and the manner of the evaluation's delivery.   First, the School District contends that it delivered Salser's performance evaluation in April 2008 because, although Salser was out on FMLA leave, it believed that she was still entitled to an annual evaluation by April 15, 2008 under Georgia law.   Further, the School District contends that it used an SRO to deliver Salser's annual evaluation because it believed that Salser was attempting to avoid all contact and communication with the School District and because it believed that she would not sign for certified mail.   Salser's suggestion that the evaluation "could have been delivered by overnight mail" does nothing to rebut the School District's legitimate, non-retaliatory reason.   *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.   Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with

43

the wisdom of that reason."); *accord Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). To the contrary, the reasonableness of the School District's belief that Salser was attempting to avoid communication was confirmed when Salser refused to accept the package from the SRO and said "I don't know what that is or what it says but I don't want it." Salser Dep. 295:1-3. Salser has also failed to produce any other evidence that the School District's legitimate, non-retaliatory reasons for the timing and manner of the evaluation's delivery were pretext for retaliation. Therefore, the School District is entitled to summary judgment on Salser's claim that the delivery of her unsatisfactory annual performance evaluation was retaliatory.

### C. Non-Renewal Letter

Salser further contends that the School District's decision to issue her a contract non-renewal letter in April 2009 was retaliatory. The School District contends that Superintendent Simms sent Salser the non-renewal letter because Salser had not returned from leave, and he was not aware that she had submitted a March 30, 2009 request to extend her leave without pay. Consistent with this legitimate, non-retaliatory explanation, Simms, upon learning of Salser's March 20, 2009 request, rescinded the April 6th letter of non-renewal before it took effect, granted Salser's request for an extension of her leave

of absence, and sent her a contract for the 2009-2010 school year. Salser has produced no evidence that the School District's legitimate, non-retaliatory reason for issuing her the April 2009 contract non-renewal letter was pretext for retaliation. Therefore, the School District is entitled to summary judgment on Salser's claim that the April 2009 contract non-renewal letter was retaliatory.

### D. Healthcare Termination

Finally, to the extent Salser contends that the School District had a role in the termination of her healthcare coverage, the School District has articulated a legitimate, non-retaliatory reason for its actions. After Salser's FMLA leave was exhausted, her healthcare coverage was continued during her first extension of leave without pay, which lasted until April 1, 2009, pursuant to a request to continue coverage submitted to SHBP. Apparently unaware that the School District had granted Salser a second extension of leave without pay, SHBP terminated Salser's healthcare coverage on May 31, 2009, one month after her first extension of leave without pay ended. The School District's benefits supervisor, Darlene Nicklow, was unaware that Salser's healthcare coverage had been terminated. On the same day Salser informed Nicklow that her coverage had been terminated, Nicklow arranged to have it reinstated retroactive to May 31, 2009. Salser has not produced any

evidence that the School District's legitimate, non-retaliatory reasons for its role (if any) in the termination of her healthcare coverage were pretext for retaliation. Therefore, the School District is entitled to summary judgment on Salser's claim that the termination of her healthcare coverage was retaliatory.

### E.   Summary

In summary, the Court finds that the School District did not retaliate against Salser by: (1) issuing her an unsatisfactory annual performance evaluation in April 2008; (2) delivering the unsatisfactory annual performance evaluation via an SRO in April 2008, while she was out on FMLA leave; (3) issuing her a contract non-renewal letter in April 2009; or (4) terminating her healthcare coverage in May 2009. For each challenged action, the School District has articulated a legitimate, non-retaliatory reason for its actions. In response, Salser has failed to direct the Court to any evidence that the School District's proffered explanation is a pretext for retaliation. Therefore, the Court finds that the School District is entitled to summary judgment on Salser's ADA and FMLA retaliation claims.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 40) is granted.

IT IS SO ORDERED, this 15th day of July, 2011.

                                    S/Clay D. Land
                                   _____
                                        CLAY D. LAND
                                   UNITED STATES DISTRICT JUDGE